E-FILED
Friday, 17 February, 2006  09:54:48 AM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## ROCK ISLAND DIVISION

1/12/06

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 06- _40004_ |
| | ) | |
| CHRISTOPHER JOSEPH CAHILL, | ) | **FILED** |
| | ) | |
| Defendant. | ) | FEB 1 6 2006 |

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

### PLEA AGREEMENT AND STIPULATION OF FACTS

Pursuant to Rule 11(c) of the Federal Rules of Criminal Procedure, the United

States of America, by Rodger A. Heaton, United States Attorney for the Central

District of Illinois, and Jeffrey B. Lang, Assistant United States Attorney, and the

defendant, Christopher Joseph Cahill, personally and by the defendant's attorney,

Edward M. Chernoff, hereby enter into this Plea Agreement.

1.    This document contains the complete and only Plea Agreement

between the United States Attorney for the Central District of Illinois and the

defendant.  This Agreement supersedes and replaces any and all prior formal and

informal, written and oral, express and implied, plea agreements between the

parties.  No other agreement, understanding, promise, or condition between the

United States Attorney for the Central District of Illinois and the defendant exists,

except as set forth in this Plea Agreement.

2.     This Plea Agreement is binding only upon the United States Attorney for the Central District of Illinois and the defendant. It does not bind any United States Attorney outside the Central District of Illinois, nor does it bind any state or local prosecutor. In addition, the Plea Agreement does not bind the Tax Division of the United States Department of Justice or the Internal Revenue Service of the United States Department of the Treasury.

3.     This Agreement is made pursuant to Federal Rule of Criminal Procedure 11(c)(1)(A) and (B), and therefore if the Court does not accept the recommendations of the parties, the defendant does not have the right to withdraw his plea of guilty.

### CHARGE, ELEMENTS, AND PENALTIES

4.     The defendant will waive indictment pursuant to Rule 7(b) of the Federal Rules of Criminal Procedure and plead guilty to the Information, in which the defendant is charged with Major Fraud Against the United States in violation of Title 18, United States Code, Section 1031.

5.     The defendant has read the charge to which the defendant is pleading guilty, and the charge has been explained to the defendant by the defendant's attorney. Furthermore, the defendant fully understands the nature and elements of the crime to which the defendant is pleading guilty. To sustain the charge of Major Fraud Against the United States in violation of Title 18, United States Code, Section

2

1031, the United States must prove the following propositions beyond a reasonable doubt:

> First, that the defendant knowingly executed or attempted to execute a scheme with the intent to defraud the United States, or to obtain money by means of materially false or fraudulent pretenses, representations, or promises;

> Second, that the scheme took place as part of the procurement of property or services as a subcontractor on a contract in which there was a prime contract with the United States;

> Third, that the value of the prime contract, or any constituent part thereof, for such property or services was $1,000,000 or more; and

> Fourth, that the gross loss to the United States Government was $500,000 or greater.

6.      The defendant understands and agrees that the offense to which he shall plead guilty carries the following potential penalties:

- up to 10 years in prison;

- up to a $5 million fine;

- up to three years supervised release; and

- a $100 special assessment.

7.      The defendant further understands that upon violation of any of the terms of the defendant's supervised release, the supervised release may be revoked and the defendant may be imprisoned for all or part of the supervised release period without credit for time previously served.

8.      The defendant understands and agrees that the Court may be required to order the defendant to pay restitution. The parties to this Agreement have not reached a determination on the issue of restitution. Restitution may include the cost of incarceration and supervision. The parties acknowledge that the Court may order restitution in whatever amount it deems proper.

## STATUTORY AND APPEAL WAIVERS

### Waiver of Right of Appeal from Conviction and Sentence

9.      The defendant is aware that federal law, specifically, Title 28, United States Code, Section 1291, affords a defendant a right to appeal a final decision of the district court and that federal law, specifically, Title 18, United States Code, Section 3742, affords a defendant a right to appeal the conviction and/or sentence imposed. Understanding those rights, and having thoroughly discussed those rights with the defendant's attorney, the defendant knowingly and voluntarily waives the right to appeal any and all issues relating to this Plea Agreement and conviction and to the sentence, including any fine or restitution, within the maximum provided in the statute of conviction, and the manner in which the sentence, including any fine or restitution, was determined, on any ground whatever, in exchange for the concessions made by the United States in this Plea Agreement, unless otherwise stated in this paragraph.

4

### Waiver of Right to Collateral Attack

10.     The defendant also understands that he has a right to attack the conviction and/or sentence imposed collaterally on the grounds that it was imposed in violation of the Constitution or laws of the United States; that he received ineffective assistance from his attorney; that the Court was without proper jurisdiction; or that the conviction and/or sentence was otherwise subject to collateral attack. The defendant understands such an attack is usually brought through a motion pursuant to Title 28, United States Code, Section 2255. The defendant and the defendant's attorney have reviewed Section 2255, and the defendant understands his rights under the statute. Understanding those rights, and having thoroughly discussed those rights with the defendant's attorney, the defendant knowingly and voluntarily waives his right to collaterally attack the conviction and/or sentence. The defendant's attorney has fully discussed and explained the defendant's right to attack the conviction and/or sentence collaterally with the defendant. The defendant specifically acknowledges that the decision to waive the right to challenge any later claim of the ineffectiveness of the defendant's counsel was made by the defendant alone notwithstanding any advice the defendant may or may not have received from the defendant's attorney regarding this right. Regardless of any advice the defendant's attorney may have given the defendant, in exchange for the concessions made by the United States in this Plea

5

Agreement, the defendant hereby knowingly and voluntarily waives his right to collaterally attack the conviction and/or sentence. The rights waived by the defendant include his right to challenge the amount of any fine or restitution, in any collateral attack, including, but not limited to, a motion brought under Title 28, United States Code, Section 2255.

## ADVISORY SENTENCING GUIDELINES

11. The defendant understands that the Court will calculate the defendant's offense level and criminal history category under the United States Sentencing Guidelines, and that the Court will use those calculations to arrive at an advisory sentencing range under the Guidelines. The defendant understands that the Court must consider the advisory Sentencing Guidelines range when imposing sentence. The Court shall also consider the other factors listed under Title 18, United States Code, Section 3553(a) in determining the specific sentence to be imposed. The defendant understands that although the Sentencing Guidelines are advisory, the Court may choose to impose sentence in accordance with the Sentencing Guidelines.

12. Based on the information currently available, the defendant and the United States agree on the following points regarding the application of the Sentencing Guidelines to the offense to which the defendant is pleading guilty:

a. The parties agree, based upon facts currently known by the United States, that the defendant intends to continue to demonstrate a recognition

6

and affirmative acceptance of personal responsibility for the defendant's criminal conduct in accordance with Section 3E1.1 of the United States Sentencing Guidelines and, in that case, a two-level reduction in the offense level would be appropriate. Acceptance of personal responsibility shall include cooperating fully with the United States Probation Office in the preparation of a presentence report and not committing any bond violations while on pretrial release, including but not limited to the commission of any local, state or federal offenses. This Agreement does not preclude the United States from changing its position if new evidence to the contrary is discovered or if the defendant later demonstrates a lack of acceptance of personal responsibility for the defendant's criminal conduct.

b.      The parties further agree that since the defendant's offense level (including adjustments for Specific Offense Characteristics and other provisions) will be 16 or higher, then the defendant qualifies for an additional one-point reduction in the defendant's offense level pursuant to United States Sentencing Guidelines Section 3E1.1(b)(2) because the defendant timely notified the United States Attorney's Office of the defendant's intention to enter a plea of guilty, thereby permitting the United States to avoid trial preparation and permitting the Court to allocate its resources efficiently.

c.     The parties further agree that the amount of the loss to the United States Government was at least $1 million but not more than $2.5 million, and that an upward adjustment of the defendant's offense level is therefore warranted under Section 2B1.1(b)(1)(I) of the United States Sentencing Guidelines.

d.     The parties further agree that a substantial part of the fraud scheme was committed from outside the United States, and that an upward adjustment of the defendant's offense level is therefore warranted under Section 2B1.1(b)(9)(B) of the United States Sentencing Guidelines.

e.     The parties have not reached any agreement with respect to the application of other potential adjustments, if any, under the Sentencing Guidelines.

13.     The defendant and the United States agree that the above statements regarding Sentencing Guidelines calculations are not binding on the Court, and relate only to the positions the parties take regarding the applicable advisory Sentencing Guidelines range based upon the information of which they are currently aware. The Court will remain free to make its own independent determination of the applicable advisory Sentencing Guidelines range. The defendant and the United States agree that if the sentence imposed by the Court falls within the applicable advisory Sentencing Guidelines range, such a sentence is reasonable, and the defendant agrees not to challenge the sentence on the basis that it is unreasonable.

8

14.     The defendant agrees that at the time of sentencing, the Court will not be bound by any recommendation made by any party, and that the Court will be free to impose whatever sentence it deems appropriate under the law, including, if appropriate, up to the statutory maximum. The defendant agrees and understands that the defendant will not be allowed to withdraw the defendant's guilty plea because of an objection to the calculation of the Sentencing Guidelines, or to the Court's sentencing findings or rulings, or because the defendant receives a sentence higher than that suggested through application of the individual Sentencing Guidelines terms agreed upon in this Plea Agreement.

15.     The United States reserves the right, in its sole discretion, to make a motion at the time of sentencing for a downward departure from the advisory Sentencing Guideline range pursuant to United States Sentencing Guidelines Section 5K1.1 if the defendant provides substantial assistance in the investigation or prosecution of other criminal offenses. The extent of any such recommended departure will depend solely upon the United States' evaluation of the nature, extent, and value of the defendant's assistance, including the defendant's truthfulness.

## DEFENDANT'S OBLIGATIONS

16.     As a condition of this entire Plea Agreement, the defendant will cooperate fully with law enforcement officials, as agreed in the cooperation

9

agreement letter dated August 1, 2005, from Assistant United States Attorney Jeffrey B. Lang to Edward M. Chernoff, Esq., and executed by the parties on August 11, 2005. A copy of the cooperation agreement is appended hereto as Exhibit A and incorporated herein by reference.

17.     The defendant agrees to and waives any rights the defendant may have under the Speedy Trial Act, and the defendant understands that his sentencing may be delayed until his cooperation has been completed so that at sentencing the court will have the benefit of all relevant information.

18.     The defendant and his attorney acknowledge that they have reviewed, and the defendant understands, the possible application of Title 18, United States Code, Section 3553(e). They further acknowledge, consistent with Application Note 3 to United States Sentencing Guidelines Section 5K1.1, that the United States is in the best position to assess the value of the defendant's cooperation to the United States and its law enforcement efforts.  In return for receiving the opportunity to cooperate with the government and for the opportunity to be considered by the government for a motion and recommendation for a downward departure pursuant to Section 5K1.1, the defendant and his attorney agree to limit any argument regarding the extent of a downward departure for substantial assistance to the

10

government to only those grounds specifically set forth in Section 5K1.1 and its application notes.

19.     The defendant further understands and agrees to pay the mandatory $100 Special Assessment for the offense to which the defendant is entering a plea of guilty, as is required under Title 18, United States Code, Section 3013.   The defendant agrees to pay this mandatory special assessment at the time of sentencing by delivering a check or money order made payable to the United States District Court and understands that he will be required to do so as a condition of this Plea Agreement.   The failure to comply with this requirement, however, will not constitute grounds for the defendant to withdraw any plea of guilty.

## THE UNITED STATES ATTORNEY'S OBLIGATIONS

20.     The United States Attorney for the Central District of Illinois agrees to bring no additional criminal charges in the Central District of Illinois against the defendant relating to or arising from the offense charged in this Information, except for any crime of violence and any crime unknown to the United States Attorney for the Central District of Illinois prior to the time this Plea Agreement is signed by the parties.

21.     The United States agrees that at the time of sentencing it will fully inform the Court of the nature, extent, and value of any cooperation rendered by the defendant.

22.   The United States agrees with its obligations as set forth in the cooperation agreement letter dated August 1, 2005, which is appended hereto as Exhibit A.

## FACTUAL BASIS

23.   The defendant will plead guilty because the defendant is in fact guilty of the charge contained in the Information.   In pleading guilty to this charge, the defendant stipulates to and admits to the following facts:

a.   On December 14, 2001, the United States Army Operations Support Command, headquartered at the Rock Island Arsenal at Rock Island, Illinois, within the Central District of Illinois, awarded the Logistics Civil Augmentation Program III ("LOGCAP III") prime contract, designated contract number DAAA09-02-D-0007, to the company now known as Kellogg Brown & Root Services, Inc. ("KBR").   As the prime contractor under LOGCAP III, KBR was to provide property and services to the United States military at locations around the world, including Iraq.

b.   The Army Field Support Command, also located at the Rock Island Arsenal, administered the LOGCAP III prime contract.   The Field Support Command's duties included the issuance of task orders to KBR under the LOGCAP III prime contract.   Each task order incorporated a statement of the work to be performed by KBR and the period of time to perform the work.   Additionally, the

12

Resource Management Unit of the Army Field Support Command managed the money for the LOGCAP III prime contract. This included the Resource Management Unit obligating funding in Rock Island, Illinois for the payment of task orders.

c.     To accomplish a given task order, KBR commonly utilized subcontractors. These subcontractors submitted invoices to KBR for their work and were paid by KBR. KBR thereafter sent public vouchers to the United States Government for the cost of the work done by the subcontractors, plus KBR's allowable fees under the LOGCAP III prime contract. The vouchers were then paid by the United States Government.

d.     Among the Army's requirements to be accomplished through the LOGCAP III prime contract was the transportation of U.S. military equipment and supplies into Iraq. KBR accomplished this, in part, through subcontracting for air freight forwarding services with EGL, Inc., a/k/a Eagle Global Logistics (EGL), a publicly-traded U.S. corporation headquartered at Houston, Texas. EGL had a world-wide network of approximately 400 facilities, agents, and distribution centers located in over 100 countries on six continents. Among EGL's locations were offices, warehouses, and other facilities at Dubai in the United Arab Emirates. KBR's subcontract with EGL was designated as Master Agreement Number GU36-HOU-A003 under a LOGCAP III task order.

13

e.      EGL was one of two air freight-forwarding companies arranging commercial air-freight flights into Baghdad, Iraq following the fall of the Saddam Hussein regime in April 2003. EGL's flights into Baghdad originated in Dubai, and were made on aircraft operated by a Middle-Eastern air charter company referred to herein as "Company A." EGL contracted with Company A to transport cargo for EGL. EGL paid Company A for shipping fees in accordance with a schedule of charges based upon the weight of the goods being shipped plus other applicable fees. Company A submitted invoices to EGL for the shipping charges. In turn, EGL submitted invoices to KBR under Master Agreement Number GU36-HOU-A003. KBR thereafter submitted public vouchers to the United States government for the shipping costs charged by EGL plus KBR's allowable fees under the LOGCAP III prime contract.

f.      From October 1, 2002 through April 8, 2005, the defendant served as EGL's Regional Vice President for the Middle East and India, and was stationed at EGL's Regional Office in Dubai. As such, the defendant was the highest-ranking EGL official in the region concerning the military shipments to Baghdad beginning in April 2003 under EGL's subcontract with KBR.

g.      In November 2003, the defendant learned that an air cargo plane of EGL's competitor air freight-forwarding company had been shot down in Iraq.

14

The defendant further learned that EGL's competitor was seeking "war risk" insurance in order to resume its air cargo flights into Baghdad. As a result, the defendant believed that EGL's competitor would be increasing its air freight fees for transporting cargo into Baghdad.

      h.     The defendant decided that EGL should likewise increase its air freight fees for transporting cargo into Baghdad. He decided that a "war risk surcharge" of $.50 for each kilogram of freight transported to Baghdad should be added to each of EGL's invoices. However, at the time, the defendant knew that Company A, which was physically transporting the air cargo to Baghdad for EGL, had not increased its fees for shipments into Baghdad on behalf of EGL.

      i.     The defendant knew that EGL was not being charged additional "war risk surcharge" fees by Company A for the shipments of U.S. military equipment and supplies to Baghdad under its subcontract with KBR. The defendant further knew that EGL had not sought or obtained any war risk insurance for such shipments. Instead, the defendant recognized an opportunity to unilaterally institute war risk surcharges and thereby increase profits to EGL. The defendant, as EGL's Regional Vice President, knew that he did not have to seek approvals from elsewhere within EGL to add such purported war risk surcharges.

15

j.    The defendant also knew that the increased profits for the war risk surcharges would be "credited" to EGL's regional office (as opposed to EGL's headquarters office in Houston) for statistics, bonuses, and other internal EGL purposes.  Thus the defendant knew that he would derive some positive personal benefits, monetary or otherwise, by increasing profits for EGL through the institution of the war risk surcharges.

k.    The defendant knew that under the LOGCAP III prime contract, KBR was being paid by the United States Government on the basis of KBR's actual costs plus allowable fees.  As a result, the defendant knew that increases in the amounts of EGL's invoices to KBR would result in corresponding increases in the amounts of the public vouchers to, and ultimate payments by, the U.S. government.  Thus the defendant knew that a direct consequence of his institution of war risk surcharges in November 2003 would be that the U.S. government have to pay KBR more for EGL's shipments of U.S. military equipment and supplies to Baghdad.

l.    After the defendant decided to institute the war risk surcharges, he directed that a letter be obtained from Company A to the effect that Company A had begun adding war risk surcharges to its invoices to EGL for air charter services from Dubai to Baghdad.  However, the defendant knew at the time that Company A had not begun charging EGL for war risk surcharges and that any letter from

16

Company A stating such would be fraudulent.    At EGL's request, Company A provided to EGL a letter dated December 1, 2003 which falsely stated that Company A had begun "charging $0.50 per kg War Risk Surcharges."  The defendant knew that this statement in the letter provided by Company A was false.

m.    From on or about November 22, 2003 through on or about July 20, 2004, EGL, via Company A, performed approximately 379 air cargo shipments of military goods from Dubai to Baghdad under its subcontract with KBR and Work Releases issued thereunder.  During that period, EGL submitted an invoice to KBR for each of those specific shipments.  The total amount of the EGL invoices for those shipments was approximately $13,263,629.  Included in each of the EGL invoices submitted to KBR during that time period was a war risk surcharge of $.50 for each kilogram of cargo shipped.  As is reflected above, Company A did not actually charge EGL any war risk surcharges for those shipments, and EGL itself did not seek or obtain any war risk insurance.  The total amount that EGL charged KBR for war risk surcharges during that time period was approximately $1,141,097.

n.    In response, KBR paid EGL on each of those invoices.  KBR then billed the U.S. government for its actual costs plus allowable fees for those particular air cargo shipments by EGL, including the non-existent war risk surcharges.  KBR did so through approximately 141 public vouchers submitted during the period

17

December 14, 2003 through August 31, 2004 to the Defense Contract Audit Agency under the LOGCAP III prime contract and applicable task order. KBR was subsequently paid on those public vouchers by the Defense Finance and Accounting Service. The amount paid to KBR for those air cargo shipments included approximately $1,141,097 in fraudulent war risk charges, plus KBR's allowable fees.

o.     Although EGL submitted invoices to KBR for war risk surcharges throughout the period from about November 22, 2003 through July 20, 2004, the defendant made the decision that EGL should stop charging KBR for the war risk surcharges as of January 2004. On or about December 24, 2003, the defendant directed that a subordinate EGL employee in Dubai send an e-mail to other EGL personnel, including company managers at its Houston headquarters, stating that effective January 1, 2004, EGL should stop billing customers for war risk surcharges. The EGL employee sent such an e-mail on December 24, 2003. Despite this e-mail, EGL's Houston office continued to include the war risk surcharge in its invoices to KBR for cargo shipments to Baghdad.

p.     In July 2004, the defendant noted that EGL was still charging the war risk surcharge to its customers for cargo shipped to Baghdad, including U.S. military supplies shipped under EGL's subcontract with KBR. The defendant sent an e-mail to EGL managers in Houston to warn that the war risk surcharge had not

applied since January 2004. EGL Houston thereafter requested that the defendant obtain a letter from Company A to the effect that the war risk surcharges were no longer being charged to EGL. As a result, the defendant directed that such a letter be obtained from Company A to the effect that Company A had stopped adding war risk surcharges to its invoices to EGL for air charter services from Dubai to Baghdad. Since Company A had never charged EGL for war risk surcharges, the defendant knew that any letter from Company A reflecting such would be fraudulent. At EGL's request, Company A provided to EGL a letter dated July 24, 2004 which stated that  Company A "will no longer be charging USD 0.50 per kg War Risk Surcharges." The defendant knew that this letter falsely conveyed that Company A had previously been charging EGL war risk surcharges.

   q. On or about July 20, 2004, EGL stopped including war risk surcharges in its invoices to KBR.

   r. In or about March 2005, after the defendant was well aware of the United States Government's investigation into EGL's charging of war risk surcharges to KBR, EGL's in-house counsel requested from the defendant backup documents to support the company's inclusion of war risk surcharges in its prior invoices to KBR. In response, the defendant directed a subordinate EGL employee in Dubai to create fraudulent Company A invoices purporting to document war risk

surcharges billed to EGL during the period from November 22, 2003 through December 2003. The EGL employee complied with the defendant's directive, initially creating three fraudulent Company A invoices, each of which purportedly billed EGL for "War Risk Surcharge." The first such invoice was in the amount of $5,991.00 for an air cargo shipment on December 18, 2003, the second invoice was for $52,864.50 for one shipment each on December 20, 21, 22 and 24, 2003, and the third invoice was for $30,800.00 for one shipment each on December 26 and 30, 2003. On March 23, 2005, the defendant transmitted those three fraudulent invoices by e-mail to in-house counsel at EGL's headquarters office in Houston. The defendant knew at the time that any fraudulent Company A invoices provided to EGL's Houston headquarters would ultimately be used in EGL's attempt to legitimize the war risk surcharges, when the defendant well knew that they were not genuine.

s.    On April 4, 2005, after having received requests from EGL's headquarters for additional Company A invoices reflecting war risk surcharges, the defendant advised EGL's in-house counsel that Company A had never charged EGL for war risk surcharges and that the three Company A invoices that he previously sent to counsel had been fabricated.

t.    The defendant is aware that the applicable task order under the LOGCAP III prime contract was incrementally funded throughout the performance

20

period of Subcontract Number GU36-HOU-A003.  The defendant is further aware that fraud in the form of inflated billings under this LOGCAP III subcontract necessarily required the Resource Management Unit of the Army Field Support Command at Rock Island, Illinois to obligate more funding to the prime contract and applicable task order than what would have otherwise been required absent the fraud.  The defendant is further aware that the value of the LOGCAP III prime contract is well in excess of $1,000,000.

u.      The defendant acknowledges that his above-summarized conduct constituted a fraud against the United States and was against the law.

## EFFECT OF VIOLATION OF AGREEMENT

24.      The defendant agrees that if the defendant violates the terms of this Plea Agreement, the United States has the option to declare the Plea Agreement null and void.  In the event the United States exercises its option to declare the Plea Agreement null and void, the United States will be completely released from all of its obligations under this Plea Agreement and the United States will be free to seek to vacate the defendant's conviction and/sentence, and to reinstate any previously dismissed charges against the defendant or to seek the defendant's resentencing. However, in the event the United States exercises its option to declare the Plea Agreement null and void, the defendant will not be allowed to withdraw from any previously accepted guilty plea. The defendant also agrees to waive any and all

21

double jeopardy rights, and the applicable statute of limitations, should the United States seek to reinstate any charges against the defendant or seek to have the defendant resentenced.

25.    Whether or not the defendant has violated the terms of the Plea Agreement shall be determined by the Court. The burden of proof shall rest with the United States to establish by a preponderance of the evidence that the defendant violated the terms of the Plea Agreement.

## WAIVER OF CONSTITUTIONAL RIGHTS

26.    The defendant understands that by pleading guilty the defendant surrenders the following rights, among others:

a.    The right to plead not guilty or persist in the plea of not guilty if already made. If the defendant persisted in a plea of not guilty to the charges the defendant would have the right to a public and speedy trial.

b.    The right to a trial by jury. The defendant has an absolute right to a jury trial. The jury would be composed of twelve persons selected at random. The jury would have to agree unanimously before it could return a verdict of either guilty or not guilty. The jury would be instructed that the defendant is presumed innocent, and that it could not convict the defendant unless, after hearing all the evidence, it was persuaded that the United States had met its burden of proving the

defendant guilty beyond a reasonable doubt. The defendant could also ask for a trial by the Judge instead of a trial by a jury.

        c.     The right to confront and cross-examine adverse witnesses. At a trial, the United States would be required to present its witnesses and other evidence against the defendant. The defendant would be able to see and hear those government witnesses and the defendant's attorney would be able to cross-examine them. In turn, the defendant's counsel could present witnesses and other evidence on the defendant's behalf. If the witnesses for the defendant refused to appear voluntarily, their attendance could be required through the subpoena power of the Court.

        d.     The right against compelled self-incrimination. At a trial, the defendant would have a privilege against self-incrimination so that the defendant could decline to testify, and no inference of guilt could be drawn from the defendant's refusal to testify. If the defendant desired to do so, the defendant could testify on the defendant's own behalf.

27.     The defendant understands that by pleading guilty the defendant is waiving all the rights set forth in the prior paragraphs. The defendant's attorney has explained to the defendant those rights and the consequences of the waiver of those rights.

**AGREED:**

**Defendant's Attorney:**

28.    I have discussed this Plea Agreement fully with my client, and I am satisfied that my client fully understands its contents and terms.  No threats, promises, or representations have been made, nor agreements reached, express or implied, to induce my client to plead guilty other than those stated in this written Plea Agreement.  I have reviewed with my client United States Sentencing Guidelines Sections 1B1.3 and 1B1.4 (relevant conduct).


Date: __1/25/06__       _S/Edward Chernoff_____
                        EDWARD M. CHERNOFF, ESQ.
                        Attorney for Christopher J. Cahill

**Defendant:**

29.    I have read this entire Plea Agreement carefully and have discussed it fully with my attorney.  I fully understand this Agreement, and I agree to it voluntarily and of my own free will.  I am pleading guilty because I am in fact guilty, and I agree that the facts stated in this Agreement about my criminal conduct are true.  No threats, promises, or commitments have been made to me or to anyone else, and no agreements have been reached, expressed or implied, to influence me to plead guilty other than those stated in this written Plea Agreement.  I am satisfied

with the legal services provided by my attorney. I understand that by signing below I am stating I agree with everything stated in this paragraph, and I am accepting and entering into this Plea Agreement.


Date: __/ 25/06__                    S/Christopher Cahill
                              _____
                              CHRISTOPHER J. CAHILL
                              Defendant

**United States:**

30.    On behalf of the United States of America, I accept and agree to this Plea Agreement.


Date: __1/3, /06__              RODGER A. HEATON
                              UNITED STATES ATTORNEY


                        S/Jeffrey B. Lang
              by:  _____
                        JEFFREY B. LANG
                        SUPV. ASSISTANT U.S. ATTORNEY
                        1830 Second Avenue, Suite 320
                        Rock Island, Illinois 61201
                        Tel: (309) 793-5884
                        Fax: (309) 793-5895



**U.S. Department of Justice**



*United States Attorney*
*Central District of Illinois*
*Headquarters Office*
*Springfield, Illinois*

*Reply to:*
*Quad Cities Division Office*
*1830 Second Avenue, Suite 320*
*Rock Island, Illinois 61201*
*(309)793-5884*
*FAX: (309)793-5895*

August 1, 2005

Edward M. Chernoff, Esq.
Stradley, Chernoff & Alford, L.L.P
Republic Building.
1018 Preston, Suite 200
Houston, Texas 77002

Re: Cooperation Agreement for
Christopher J. Cahill

Dear Mr. Chernoff:

It is my understanding that your client, Christopher J. Cahill, desires to cooperate with the government in its efforts to enforce federal law on the condition that his statements are protected by a grant of use immunity by the federal government. This letter is intended as a grant of conditional use immunity.

To avoid any misunderstanding, the specific terms of this grant of immunity are as follows:

1.  The federal government agrees that no statement made or information provided pursuant to this agreement will be directly used as material evidence against your client in any federal criminal case, except for (1) prosecutions for making false statements or perjury during statements made pursuant to this agreement; (2) prosecutions for felony offenses involving the actual or threatened use of violence, and attempts and conspiracies to commit such, (3) use as impeachment or rebuttal evidence should your client subsequently testify or take a factual position contrary to the information that he provides pursuant to this agreement, (4) forfeiture proceedings, and (5) supervision revocation proceedings. The government will remain free to discharge its duty to the court, if such duty exists under the circumstances, by informing the court of any information that your client provides. The court will also be notified that such information was obtained pursuant to this grant of use immunity.

2.  Your client agrees that any statement made or information provided pursuant to this agreement may be directly or indirectly used to obtain leads to other evidence, which evidence may be used against him in any criminal, civil, forfeiture, or administrative hearing, trial or other proceeding, including the sentencing hearing. It is intended by the government and acknowledged by your client that this provision eliminates the need for a <u>Kastigar</u> hearing wherein, absent this provision, the government would be required to prove that evidence being offered was not obtained <u>through information</u> provided by your client while cooperating with the government.

GOVERNMENT
EXHIBIT
A
06-40004

3.    Your client agrees that he will provide <u>complete</u> and <u>truthful</u> information to law enforcement officials regarding everything he knows or has reason to believe about the criminal conduct of himself, if any, and that of other persons. Your client also agrees to produce any and all documents and physical evidence of any kind in his possession or under his control which relate to the information that he provides.

4.    Your client agrees to provide <u>complete</u> and <u>truthful</u> testimony to any grand jury, trial jury, or judge in any proceeding in which he may be called to testify by the government.

5.    You and your client further acknowledge and agree that the federal government's grant of use immunity herein is entirely conditioned upon your client's complete compliance with each and every term of this agreement. Should your client knowingly make any materially false statement or omission in providing information or testimony under this agreement, the federal government will be entitled to use his statements and evidence that he provides to institute and support a criminal prosecution for any offense as well as a prosecution for giving false statements and perjury.

6.    For instance, your client must neither conceal or minimize his own actions or involvement in any offense, nor conceal, minimize, fabricate, or exaggerate anyone else's actions or involvement in any offense. He must be completely truthful about the facts whatever those may be.

7.    Your client understands that the offenses of giving false statements and of perjury are felonies, each instance of which is punishable by up to five years in prison plus a $250,000 fine.

8.    Your client hereby agrees to undergo a polygraph examination to confirm any or all of the information that he provides pursuant to this cooperation agreement.

9.    Any material breach of any provision of this agreement by your client will void this agreement in its entirety and will release the federal government from any obligation under this agreement. Any controversy concerning whether your client has knowingly made any materially false statement or omission during his cooperation, or has otherwise materially breached this cooperation agreement, shall be brought to the attention of, and determined by, the U.S. District Court.

10.   At this time the government is not making, and has not made, any promise or commitment of any kind to your client regarding the prosecution of any offense or the sentence in any case.

11.   This agreement is limited to the statements made and given by your client after the execution of this cooperation agreement and does not apply to statements, if any, given by him prior thereto.

12.   This letter embodies the entirety of the federal government's immunity agreement with your client.   No other promise or agreement exists between your client and the federal government regarding such immunity.

Very truly yours,

JAN PAUL MILLER
UNITED STATES ATTORNEY

By: _____

JEFFREY B. LANG
SUPERVISORY ASSISTANT U.S. ATTORNEY

We have read this letter entirely, and we understand and completely agree to the above terms. No promises have been made other than those stated in this letter regarding cooperation and use immunity.

_____          Date: August __11__, 2005
Christopher J. Cahill

_____          Date: August __11__, 2005
Edward M. Chernoff
Attorney for Christopher J. Cahill

Page 3 of 3